## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| TRACEY RICHARDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 16-cv-01135-JHE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION[1]

Plaintiff Tracey Richardson ("Richardson") seeks review, pursuant to 42 U.S.C. § 405(g),

§ 205(g) of the Social Security Act, of a final decision of the Commissioner of the Social

Security Administration ("Commissioner"), denying her request for reconsideration of the

cessation of her supplemental security income ("SSI") benefits.[2]  Richardson timely pursued and

exhausted her administrative remedies.  This case is therefore ripe for review under 42 U.S.C.

§ 405(g).  The undersigned has carefully considered the record and, for the reasons stated below,

the Commissioner's decision is **AFFIRMED.**

## I. Factual and Procedural History

Richardson protectively filed for SSI on February 19, 2003, alleging disability on that

date.  (Tr. 72).  On May 7, 2004, the Commissioner found Richardson disabled and issued a fully

favorable decision.  (Tr. 69-71).  On November 29, 2011, the Commissioner determined

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 15).

[2] The judicial review provisions for disability insurance benefits claims, 42 U.S.C. § 405(g), apply to claims for SSI.  See 42 U.S.C. § 1383(c)(3).

Richardson's disability had ceased as of November 1, 2011. (Tr. 87). On January 11, 2012, Richardson requested the agency reconsider the termination of her benefits, and, after review, the agency denied Richardson's claim on March 27, 2013. (Tr. 107). Richardson requested a hearing, where she appeared on February 27, 2014. (Tr. 36-65). After the hearing, the Administrative Law Judge ("ALJ") denied Richardson's claim on November 20, 2014. (Tr. 20-31). Richardson sought review by the Appeals Council, but it declined her request on May 16, 2016. (Tr. 1-7). On that date, the ALJ's decision became the final decision of the Commissioner. On July 11, 2016, Richardson initiated this action. (*See* doc. 1).

At the date on which Richardson's disability allegedly ceased, she was thirty-three years old with a ninth-grade education and no past relevant work. (Tr. 30, 50). She alleges she is unable to work due to mental retardation. (Tr. 93).

## II. Standard of Review[3]

The court's review of the Commissioner's decision is narrowly circumscribed. The function of this Court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This Court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as

---

[3]In general, the legal standards applied are the same whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations for statutes or regulations found in quoted court decisions.

adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

This Court must uphold factual findings supported by substantial evidence. "Substantial evidence may even exist contrary to the findings of the ALJ, and [the reviewing court] may have taken a different view of it as a factfinder. Yet, if there is substantially supportive evidence, the findings cannot be overturned." *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). However, the Court reviews the ALJ's legal conclusions *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

### III. Statutory and Regulatory Framework

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder. [4] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish entitlement to disability benefits, a claimant must provide evidence of a "physical or

---

[4]The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499.

mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

Once disability has previously been established, the Regulations provide a seven-step process for determining whether a claimant continues to be disabled. 20 C.F.R. § 416.994(b)(5)(i-vii). The Commissioner must determine in sequence:

(1) Whether the claimant has an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant does, the claimant's disability continues. If not, the evaluation proceeds to step two.

(2) Whether the claimant has experienced medical improvement. If the claimant has, the evaluation proceeds to step three; if not, the evaluation proceeds to step four.

(3) Whether the claimant's medical improvement is related to her ability to work. If it is, the evaluation proceeds to step five; if not, the evaluation proceeds to step four.

(4) Whether an exception under 20 C.F.R. §§ 416.994(b)(3)-(4) applies. If no exception applies, the claimant's disability continues. If an exception in (b)(3) applies, the evaluation proceeds to step five. If an exception in (b)(4) applies, the claimant is not disabled.

(5) Whether the claimant has a medically severe impairment or combination of impairments. If the claimant does, the evaluation proceeds to step six; if not, the claimant is not disabled.

(6) Whether the claimant is unable to perform any past relevant work. If the claimant is unable to perform past relevant work, the evaluation proceeds to step seven; if not, the claimant is not disabled.

(7) Whether the claimant is unable to perform any other work within the national economy. If the claimant is unable to do so, the claimant is disabled; if not, the claimant is no longer disabled.

*Allen v. Astrue*, No. 3:11-CV-04322-KOB, 2013 WL 5519646, at *2 (N.D. Ala. Sept. 30, 2013) (citing 20 C.F.R. § 416.994(b)(5)). Medical improvement is defined as:

any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [he] w[as] disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairments.

20 C.F.R. § 404.1594(b). To terminate benefits, the Commissioner may not focus only on current evidence of disability, but must also "evaluate the medical evidence upon which [the claimant] was originally found to be disabled." *Solomon v. Comm'r, Soc. Sec. Admin.*, 532 F. App'x 837, 839 (11th Cir. 2013) (quoting *Vaughn v. Heckler*, 727 F.2d 1040, 1043 (11th Cir.1984) (per curiam)). To that end, "[a] comparison of the original medical evidence and the new medical evidence is necessary to make a finding of improvement." *McAulay v. Heckler*, 749 F.2d 1500, 1500 (11th Cir. 1985) (per curiam) (citation omitted). The Commissioner's decision is based on the weight of the evidence, with "no initial inference as to the presence or absence of disability being drawn from the fact that [the claimant has] previously been determined to be disabled." 20 C.F.R. § 404.1594(b)(6).

## IV. Findings of the Administrative Law Judge

After consideration of the entire record and application of the sequential evaluation process, the ALJ made the following findings:

Prior to beginning the sequential evaluation, the ALJ identified the May 7, 2004 decision as the "comparison point decision" ("CPD"), which is the most recent favorable medical decision finding that the claimant was disabled. (Tr. 24). The ALJ found that, at the time of the CPD, Richardson had the medically determinable impairments of mental retardation (now intellectual disability) and depression, and that those impairments had been found to meet Listing 12.05C. (*Id.*). The ALJ also determined that as of November 1, 2011, Richardson had the medically determinable severe impairment of organic brain disorder/borderline intellectual function. (Tr. 25).

At Step One, the ALJ determined that, since November 1, 2011, Richardson had not had an impairment or combination of impairments that meets or medically equals one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 25). At Step Two, the ALJ found medical improvement had occurred as of November 1, 2011. (Tr. 26). At Step Three, the ALJ found the medical improvement was related to Richardson's ability to work because her impairments no longer met or medically equaled the same listing met at the time of the CPD. (*Id.*). Because the ALJ found medical improvement, he proceeded to Step Five, at which he found Richardson had continued to have the severe impairment of borderline intellectual functioning since November 1, 2011. (*Id.*).

Before proceeding to Step Six, the ALJ determined Richardson's residual functioning capacity ("RFC"), which is the most a claimant can do despite her impairments. *See* 20 C.F.R. § 404.1545(a)(1). The ALJ determined that, as of November 1, 2011, Richardson had the RFC to

> perform a full range of work at all exertional levels but with the following nonexertional limits: The claimant is able to understand, remember, and carry out short, simple instructions but not detailed instructions. She is able to attend to simple tasks for the two-hour periods required in competitive work with regular scheduled breaks. She is able to handle casual or occasional interaction with the public, co-workers, and supervisors; and she can handle gradual and infrequent changes in the workplace. The claimant would need assistance in setting goals.

(Tr. 27).

At Step Six, the ALJ found Richardson had no past relevant work. (Tr. 30). At Step Seven, the ALJ determined, based on Richardson's age, education, work experience, and RFC, jobs exist in significant numbers in the national economy Richardson could perform. (*Id.*). The ALJ concluded Richardson's disability ended on November 1, 2011, and that she had not become disabled again since that date; therefore, he denied her claim. (Tr. 31).

## V. Analysis

Richardson raises three objections to the ALJ's findings: (1) that the ALJ improperly found medical improvement without evidence; (2) that the ALJ erred by finding Richardson has the severe impairment of borderline intellectual functioning; and (3) that the ALJ erred by finding Richardson did not meet Listing 12.05B. (Doc. 11 at 2). None of these grounds warrant reversal.

### A. The ALJ's finding of medical improvement was supported by substantial evidence.

Richardson argues the ALJ's decision finding medical improvement in her previously-disabling intellectual disability was unsupported by evidence, as it was inconsistent with IQ scores and opinion evidence from 2002 and 2003. (Doc. 11 at 4-7). The Commissioner contends the ALJ, applying the proper standard, appropriately found medical improvement, primarily based on the November 18, 2011 psychological examination of Dr. Michael Griffin. (Doc. 12 at 8-11).

Richardson was initially found disabled at Listing 12.05C, a paragraph of the Listing now called "intellectual disability," but which was called "mental retardation" at the time of Richardson's CPD.[5] The Listing provides:

> Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

---

[5] Apart from the change in nomenclature, Listing 12.05 has remained unchanged in all relevant respects since the date of Richardson's CPD. Unless referring explicitly to the Commissioner's previous decision or to Richardson's previous diagnoses, this memorandum opinion will refer to the Listing and the condition as "intellectual disability."

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.05. When a claimant is found disabled at a listing, the Regulations provide a specific set of instructions for determining whether medical improvement related to the claimant's ability to work has occurred:

If our most recent favorable decision was based on the fact that your impairment(s) at the time met or equaled the severity contemplated by the Listing of Impairments in appendix 1 of this subpart, an assessment of [the claimant's] residual functional capacity would not have been made. If medical improvement has occurred and the severity of the prior impairment(s) no longer meets or equals the same listing section used to make our most recent favorable decision, we will find that the medical improvement was related to [the claimant's] ability to work . . . If the appendix level of severity is met or equaled, the individual is deemed, in the absence of evidence to the contrary, to be unable to engage in substantial gainful activity. If there has been medical improvement to the degree that the requirement of the listing section is no longer met or equaled, then the medical improvement is related to [the claimant's] ability to work.

20 C.F.R. § 404.1594(c)(3)(i). Therefore, to analyze whether Richardson had experienced medical improvement related to her ability to work, the ALJ was required to assess whether Richardson still met the criteria of Listing 12.05C, and was required to do so by comparing the new medical evidence to the evidence used on Richardson's CPD to support the finding of disability.

As the ALJ in this claim noted, Richardson's disability on the date of her CPD was based on consultative psychological evaluations performed by Dr. John R. Goff and Dr. Joseph E. Maio. (Tr. 25, 73-75). Dr. Goff examined Richardson on November 15, 2002. (Tr. 240). Dr.

Goff observed that Richardson "has some difficulties as a historian, primarily because she is functioning at such a low level cognitively." (*Id.*). For example, Richardson could not recall where she was born, her parents' vocational activities when she was a child, any serious accidents or illnesses during childhood or adolescence, repeating any grades in school, or, generally, "much of anything." (*Id.*). Although she was able to provide personal and current information, recite the alphabet, and count backwards from twenty, Richardson was unable to provide Dr. Goff with the name of the president, the previous president, the governor, or the sheriff. (Tr. 241). Richardson reported she was depressed "all the time," but could not say why. (*Id.*). Richardson reported she had worked at McDonald's for "a very short period." (*Id.*). Because Richardson had mentioned Social Security to the counselor who referred her to Dr. Goff, Dr. Goff administered the 21-Item Test, which is "specifically designed to assess response bias, that is to say, malingering." (*Id.*). Richardson obtained a 16 on that test, from which Dr. Goff concluded Richardson was not exaggerating her difficulties. (*Id.*).

Although he had been asked to examine Richardson for learning disabilities, Dr. Goff stated he "really could not do that." (*Id.*). Instead, he assessed Richardson's intellectual function by administering the Wechsler Adult Intelligence Scale (WAIS-III), as well as the Reitan-Indiana Aphasia Screening Test and the Wide Range Achievement Test (WRAT-3). (*Id.*). On the WAIS-III, Richardson obtained a full scale IQ score of 56, a verbal scale IQ score of 59, and a performance or visuopractic IQ score of 60. (*Id.*). Dr. Goff observed that these scores fall within the mildly retarded range of psychometric intelligence, with the full scale score falling towards the lower end of that range. (*Id.*). Subscale scores were also "pretty consistent" with the mildly retarded range. (Tr. 242). Utilizing the Reitan-Indiana Aphasia Screening Test, Dr. Goff concluded Richardson was able to read a sentence at about the second-grade level (but not at the

fifth-grade level), unable to perform simple mathematical calculations on paper or mentally, and had difficulty drawing a clock.  (*Id.*).  Based on Richardson's scores on the WRAT-3, Dr. Goff determined Richardson was at about a first-grade level for word recognition and a second-grade level for spelling and arithmetic.  (*Id.*).  Richardson could identify a few single-syllable words and the word "animal," spell her name and half a dozen single-syllable words, and perform simple addition and subtraction; however, Richardson was unfamiliar with multiplication, division, or the use of decimals or fractions.  (*Id.*).

Dr. Goff stated he could not assess Richardson's adaptive skills, but concluded it was "pretty apparent that they are deficient," citing the facts Richardson does not drive a car and has never had a driver's license as well as her "deficits in functional academics."  (*Id.*).  Thus, he concluded she meets the criteria for substantial deficits in at least two adaptive areas.  (*Id.*).  Dr. Goff also noted that he did not have Richardson's school records, but based on Richardson's attestation she was in special education classes (which Dr. Goff noted was "almost assuredly the case"), Dr. Goff found Richardson met the criteria for the existence of difficulties during the developmental period.  (*Id.*).  Therefore, Dr. Goff concluded Richardson was not "a good vocational rehabilitation candidate" and recommended she apply for SSI.  (Tr. 243).  He diagnosed her with "Mental Retardation, low mild."  (*Id.*).  He also stated he did not think Richardson demonstrated a primary thought or mood disorder.  (*Id.*).

Dr. Maio's April 17, 2003 evaluation was less conclusive.  Richardson stated she was expelled from school in the tenth grade due to behavior problems and had a history of special education.  (Tr. 244).  While Richardson said she had worked as a cook at McDonald's for only two weeks, Dr. Maio noted Richardson's paperwork indicated she had worked there for over two years; confronted with this, Richardson became flustered and said "It could have."  (*Id.*).

Richardson reported no difficulties maintaining her personal care, although she stated she needed help with grocery shopping and paying the bills because of her difficulties with handling money. (*Id.*). Other than watching television, Richardson reported few activities. (*Id.*).

Dr. Maio characterized Richardson's level of cooperation and reliability as "questionable." (Tr. 245). He noted discrepancies between Richardson's responses earlier in the interview, when she could not name the month, and later in the interview, when she "had no difficulty stating that it was April." (*Id.*). Dr. Maio was also suspicious of Richardson's apparent difficulties in counting backwards from twenty, observing that she was looking at the clock on the wall as she did so. (*Id.*). Dr. Maio noted Richardson's immediate recall was intact and her recent memory fair, but that Richardson struggled with remote memory, possibly due to evasiveness or limited intellectual ability. (*Id.*). Richardson appeared to reason concretely and had a lucid though process, although she said that she heard voices. (*Id.*). Dr. Maio noted Richardson was unable to provide details about these voices and had the impression Richardson could have been making up that response; in any event, he concluded there was no psychosis. (*Id.*). Dr. Maio also observed Richardson displayed a euthymic affect, although she reported feelings of depression, loneliness, and isolation, with occasional suicidal thoughts (though she denied suicidal intent). (*Id.*).

Dr. Maio also administered the WAIS-III. Richardson obtained a verbal scale IQ score of 59, a performance scale IQ score of 63, and a full scale IQ score of 57, with a 95 percent confidence interval for the full scale score of 54-62; this placed Richardson in the mildly deficient range. (Tr. 245-46). However, Dr. Maio observed Richardson's effort and motivation were weak and that "[i]t is possible she may have intentionally done poorly. Therefore, test results may be an underestimate of abilities, although I suspect that she does function

intellectually at a low level." (Tr. 245). Dr. Maio stated it was likely Richardson functioned in the mildly deficient range, with a very limited ability to learn. (Tr. 246). Dr. Maio noted that "[a] diagnosis of mental retardation would require assessment of deficits in adaptive functioning in addition to the IQ scores." (*Id.*). He also observed Richardson's reported symptoms were consistent with a major depressive disorder but could only provisionally diagnose that owing to Richardson's unreliable reporting. (Tr. 246-47). Because of the uncertainty surrounding Richardson's past work, Dr. Maio stated Richardson's "actual degree of impairment overall is hard to assess," although he posited that if Richardson had worked for two years, she should still have the ability to perform unskilled labor. (Tr. 247). He ultimately diagnosed Richardson with mild mental deficiency (rule out mild mental retardation), with a provisional diagnosis of major depressive disorder, moderate to severe. (*Id.*).

Assessing the consultative examiners' opinions, the ALJ on Richardson's CPD found they presented "remarkably similar findings but different conclusions." (Tr. 83). He resolved these conflicts in part by noting Richardson's earnings record confirmed that she had worked weeks rather than years and that her "memory and concentration abilities [during Dr. Maio's examination] could well have been affected by her frustration at being unable to explain the discrepancy or to convince Dr. Maio that she was being truthful." (*Id.*). The ALJ also sided with Dr. Goff's diagnosis of mental retardation based on Dr. Goff's recognition of Richardson's adaptive skills deficits in functional academics, transportation, and community services use over Dr. Maio's decision to refrain from diagnosing the condition due to lack of assessment of adaptive skills deficits. (*Id.*). The ALJ finally concluded that, although Dr. Goff had not diagnosed a mood disorder, Dr. Maio's provisional diagnosis of depression was consistent with Richardson's report to Dr. Goff and with her descriptions of her daily activities. (Tr. 83-84).

Implicit in this finding was the ALJ's skepticism of Dr. Maio's suspicions Richardson was exaggerating her symptoms and thus unreliable. Based on this, the ALJ concluded Richardson had the severe impairments of mental retardation and depression and found her disabled at Listing 12.05C. (Tr. 75).

The ALJ in the current claim found medical improvement in both Richardson's depression and intellectual disability. (Tr. 26). To do so, he relied heavily on the opinion of Dr. Michael Paul Griffin. (Tr. 25-26). Dr. Griffin evaluated Richardson on November 1, 2011, on a referral from the Disability Determination Service. (Tr. 258). Richardson reported numerous details of her personal and family history, including her birthplace (Marengo County, Alabama) and where she was raised (mainly Demopolis, Alabama and Tuscaloosa, Alabama). (*Id.*). Richardson also reported that her father died when she was four years old, that her mother was her primary caretaker, and that she has two brothers and five half-brothers, some of whom she is close to. (*Id.*). Richardson also recounted details of her relationships with the three fathers of her children, which included physical and emotional abuse. (Tr. 258-59).

Richardson reported more details of her educational background to Dr. Griffin than she had previously provided to Dr. Goff and Dr. Maio. She stated she had completed ninth grade and then dropped out after becoming pregnant with her first child, citing her inability to manage raising her child and school demands. (Tr. 259). Richardson stated she planned to earn her GED but had trouble finding time to do so. (*Id.*). She stated she had enjoyed school and gotten mostly A's, but failed the eighth grade for unspecified reasons; she also reported she had been in special education math classes in seventh grade. (*Id.*). She reported a history of physical fights and trouble at school due to "people messing with [her]" and that she had been suspended three times and expelled once. (*Id.*). She denied this type of behavior at her workplaces, although she noted

she had been fired from her job at McDonald's due to arriving to work late and angry after an argument with one of her boyfriends, and that she "was not behaving wholly appropriate at work." (*Id.*). In addition to the year-long employment she reported with McDonald's, Richardson reported working at Hardee's for a year. (*Id.*). Richardson reported handling her personal finances, but suggested difficulties in handling money. (*Id.*).

As to her mental health, Richardson stated she had suffered from depression due to her relationship problems with two of the fathers of her children. (*Id.*). She reported depressive symptoms of mood fluctuations, ranging from sleeping all day to keeping busy to "try to stay occupied." (*Id.*). She stated she had "pretty serious" suicidal ideations in the past, but denied having made suicidal gestures. (Tr. 259-60). Dr. Griffin noted Richardson had never received inpatient or outpatient mental health treatment or been prescribed psychiatric medications by her primary care provider. (Tr. 260). Dr. Griffin observed Richardson was open and cooperative, put forth consistent effect, and was a good informant. (Tr. 261). She stated she felt happy "most of the time" over the past month, was sad occasionally "because it is hard to get around [without a license]," anxious twice, and "not at all" irritable, with no suicidal thoughts. (*Id.*).

In recounting the history of Richardson's present illness, Dr. Griffin identified three components based on the records provided (and completed) by Richardson's mother: "mental" problems, depression, and a learning disability. (Tr. 260). However, Richardson herself identified no reasons why she was receiving disability benefits, and suggested several examples of jobs she could do: stocking a warehouse, cooking at a restaurant, and being a housekeeper; she did not report any of the conditions identified by her mother to be problematic enough to prevent her from working. (*Id.*). Dr. Griffin opined the learning disability "suggested by records and partly confirmed by her self-report" was likely a lifelong condition which has neither improved

nor worsened over time, and, similarly, the "mental" problems (which he took to mean difficulty in interpersonal interaction) were likely to have remained relatively constant. (*Id.*). However, he found Richardson's symptoms of depression appeared to have been more acute in the past and worsened by problems in her relationships or abuse by her partners. (*Id.*).

Dr. Griffin also questioned Richardson about her daily activities, which she reported as waking early, helping her children prepare for school, cleaning the house, shopping for food, doing the laundry, and cleaning up her yard. (Tr. 260-61). Somewhat contrary to her report to Dr. Goff, Richardson stated she could drive, but lacked a license. (Tr. 261). Richardson reported going to the park with her children and watching movies as activities she did for fun as well noting she had more interests than she had had in the past. (*Id.*).

Based on his observation, Dr. Griffin concluded Richardson's "self-reported clinical presentation is not wholly consistent with an active psychiatric diagnosis at this time." (*Id.*). He noted that Richardson had potentially met the criteria for a depressive disorder in the past, she reported no ongoing depressive symptoms, and the previous symptoms she described did not appear to meet the criteria for a diagnosis. (*Id.*). Likewise, Richardson's personality issues did not warrant a diagnosis. (*Id.*). Dr. Griffin noted Richardson appeared to have a low average or borderline IQ, and there was no information available at the time to support a diagnosis of mental retardation; Richardson "did not display most of the deficits described by previous evaluators, and she certainly did not reach the level of impairment suggested by the records available." (*Id.*). Therefore, Dr. Griffin diagnosed Richardson with borderline intellectual functioning, which he said likely conformed to her history (contrary to her previous diagnoses of mental retardation); regardless, Dr. Griffin opined Richardson's intellectual functioning was "not so impaired as to prevent her from working *if she chooses to do so*." (Tr. 262) (emphasis in

original).  Dr. Griffin also specifically declined to diagnose Richardson with depression, stating she had not described "any ongoing depressive symptoms which would impact her ability to maintain gainful employment" and that she would not require (though she would potentially benefit from) ongoing mental health treatment in order to work.  (*Id.*).

The ALJ's conclusion medical improvement occurred was supported by substantial evidence.  While Richardson argues there was "no evidentiary basis" for finding medical improvement in the absence of new "objective evidence showing improvement in Ms. Richardson's cognitive functioning" and points to Dr. Griffin's conclusion Richardson's learning disability, if any, had likely not changed over time, (doc. 11 at 7), she misstates the inquiry.  The ALJ did not find there had been improvement in Richardson's cognitive functioning or IQ; he found there had been an improvement in Richardson's depression and adaptive functioning, either of which would mean that Richardson did not satisfy the criteria of Listing 12.05C despite her low IQ score.  To the extent Richardson challenges Dr. Griffin's opinion as "not supported by any evidence" (and thus unable to support the Commissioner's decision) because Dr. Griffin did not administer objective tests, (doc. 13 at 3), Dr. Maio's provisional diagnosis of depression was, like Dr. Griffin's opinion, based on his interactions with Richardson rather than any objective testing.  Dr. Goff's analysis of Richardson's adaptive skills were also not based on objective testing.  Dr. Goff specifically noted he "could not assess the patient's adaptive skills"; instead, he relied on the "pretty apparent" nature of the adaptive skills deficits based on Richardson's lack of a driver's license, deficits in functional academics, and the fact she did not drive a car.  (Tr. 242).  Dr. Griffin's opinion as to adaptive deficits and depression is precisely as valid a basis for the Commissioner's decision as either of these opinions, notwithstanding Dr. Griffin did not administer objective testing.

As to Richardson's depression (which, coupled with a low IQ score, satisfied the "other mental impairment imposing an additional and significant work-related limitation of function" subsection of Listing 12.05C) the ALJ found at Step One of his inquiry that the evidence of depression established "only mild limitations in activities of daily living, social functioning, and concentrations, persistence and pace, and a single episode of decompensation that was not of extended duration." (Tr. 26). He found Dr. Griffin's report provided evidence that, even if it existed in the past, Richardson's depression had improved to the extent it was no longer a medically determinable condition. (Tr. 25-26). Both Dr. Goff and Dr. Griffin had declined to diagnose depression, and the only diagnosis at the time of Richardson's CPD—Dr. Maio's—was provisional, owing to his suspicions Richardson was an unreliable source for her symptoms. Notably, the symptoms of which Dr. Maio was skeptical were inconsistent with the lack of symptoms Richardson reported to Dr. Griffin. The ALJ also observed Richardson had reported no symptoms of depression at the hearing. (Tr. 27). Richardson points to nothing evidencing depression as a medically determinable impairment beyond November 1, 2011. Although the ALJ noted several episodes of depression postdating that date when he assessed Richardson's RFC, he also stated the symptoms had not persisted for a 12-month period and that the medical evidence nevertheless indicated improvement from the CPD. (Tr. 28-29).

Turning to Richardson's functional abilities, the ALJ determined the "deficits in adaptive functioning" component necessary to meet the diagnostic criteria in Listing 12.05's introductory paragraph—which are required for a finding of disability under any of the Listing's subparagraphs, *see O'Neal v. Comm'r of Soc. Sec.,* 614 F. App'x 456, 459 (11th Cir. 2015) (citing *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)—were no longer present. A valid IQ score of 70 or below creates a presumption of adaptive deficits manifesting prior to age 22,

17

which the Commissioner may rebut by presenting evidence of the claimant's work history and daily life. *See O'Neal*, 614 F. App'x. at 459-60 (citing *Hodges v. Barnhart*, 276 F.3d 1265, 1269 (11th Cir. 2001). The ALJ did so here. The only diagnosis in the record of mental retardation was Dr. Goff's, based, as noted above, on his observations about Richardson's driving and academic deficits. However, as the ALJ found, neither Dr. Griffin's evaluation nor Richardson's testimony at the hearing support the deficits Dr. Goff identified. The ALJ noted Richardson was readily able to provide information to Dr. Griffin she had previously claimed to be unable to provide to Dr. Goff and Dr. Maio, and Richardson "testified that she runs her household, manages the money, takes public transportation, and gets her children off to school every day." (Tr. 25, 43-49). The only limitations in her daily activities Richardson reported at the hearing involved relying on others for transportation. (Tr. 47-48). While Dr. Goff relied on Richardson's reports of not driving and lacking a driver's license, Richardson testified she had never tried to obtain a driver's license due to the fact she "had nobody to help teach [her] how to learn how to drive," (tr. 47), and Richardson stated to Dr. Griffin she knew how to drive, (tr. 261). The ALJ's finding was supported by substantial evidence.

To counter this, Richardson points to two third-party function reports created by Gertrude Hogan, Richardson's friend or aunt-in-law, in 2011 and 2012 indicating Richardson required assistance in shopping, paying bills, cleaning, washing, taking her medicine, and other activities. (Doc. 11 at 6). Richardson also notes her own function report from May 21, 2012, prepared with the assistance of Hogan, which alleged substantially the same restrictions as Hogan's 2012 third-party function report. (*Id.*). Leaving aside that the role of the Court is not to reweigh the evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir.2005), the ALJ considered Hogan's and Richardson's reports and assigned them little weight as inconsistent with each other (*e.g.*,

stating in 2011 that Richardson could perform essentially all activities except driving and using a checkbook, (tr. 173-80), and alleging much greater restrictions in 2012 regarding general activities and handling money, (tr. 198-205)), inconsistent with Richardson's own testimony and reports, and unsupported by the medical record. (Tr. 27-29). Richardson does not directly contest the ALJ's decision to do so, but that decision was supported by substantial evidence.

Based on a comparison of the evidence at Richardson's CPD and the new evidence presented to him, the ALJ's finding of medical improvement in both Richardson's depression and her adaptive skills was supported by substantial evidence. Therefore, there is no basis to reverse his decision.

### B. The ALJ's finding of borderline intellectual functioning as a severe impairment was not reversible error.

Next, Richardson argues the ALJ erred by finding Richardson had the severe impairment of borderline intellectual functioning. (Doc. 7). In support, she cites the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), which defines "borderline intellectual functioning" as an IQ in the 71-84 range. (*Id.*). Because Dr. Goff and Dr. Maio each found IQ scores below this range and Dr. Griffin did no IQ testing, Richardson argues Dr. Griffin's statement Richardson "likely has a history of Borderline Intellectual Functioning — not Mental Retardation" and accompanying diagnosis, (tr. 262), are "nothing more than supposition, conjecture, and speculation." (Doc 11 at 7-8).

Despite its framing, this appears to be essentially the same argument presented in Richardson's first allegation of error; the unstated conclusion is the ALJ erred by finding borderline intellectual functioning *instead of* intellectual disability, which is the severe impairment Richardson believes to be supported by the record. As discussed above, however,

Richardson's medical improvement means she does not meet the diagnostic criteria in Listing 12.05's introductory paragraph. In the absence of the additional criteria that led to Richardson's diagnosis of mental retardation (and her original finding of disability), the ALJ was correct not to rely on Dr. Goff's diagnosis to supply a severe impairment. The evidence establishes if a severe impairment exists, it is something other than intellectual disability.

Even assuming Dr. Griffin's specific diagnosis of borderline intellectual functioning was inappropriate absent additional IQ testing and thus that the ALJ should have labeled Richardson's condition something else, Richardson provides no authority to support that amounts to reversible error when the ALJ's analysis of her symptoms—whatever they should have been called—was supported by substantial evidence, and when the RFC the ALJ formulated accounted for those symptoms.[6] Step Five in the cessation of benefits framework mirrors Step Two in the five-step denial of benefits framework. *Compare* 20 C.F.R. § 416.994(b)(5)(v) *with* 20 C.F.R. § 404.1520(a)(4)(ii). Each acts as a filter to determine whether the ALJ proceeds with the analysis or ends it with a finding of not disabled, and the fact that a severe impairment was identified *at all* is sufficient to move the ALJ along to determining how the claimant's symptoms affect her ability to work. *Cf. Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) (examining denial of benefits framework). Richardson's argument is a question of semantics; what the ALJ called the severe impairment is irrelevant to whether reversible error—i.e., failing to find any severe impairment when one existed and thus ending the analysis—occurred at Step Five. If an error resulted from the ALJ's incorrect nomenclature, it was harmless. *Cf. Freeman v. Comm'r, Soc. Sec. Admin.*, 593 F. App'x 911, 914-15 (11th Cir.

_____

[6] Notably, Richardson does not challenge the RFC (apart from, obliquely, her general attacks on the ALJ's failure to find her disabled at the listings).

2014) (finding, in denial of benefits case, an ALJ's alleged error in failing to find a particular severe impairment was harmless when the ALJ considered the symptoms in subsequent steps).

### C. The ALJ's conclusion Richardson did not meet the criteria for Listing 12.05B was supported by substantial evidence.

Richardson's final argument is the ALJ erred in finding Richardson did not meet Listing 12.05B. (Doc. 11 at 8). She bases this on her low IQ scores, which she says are supported by Dr. Goff's opinion as to her adaptive skills deficits as well as her reports of daily functioning. (*Id.* at 8-9). In addition to the requirements of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" common to all intellectual disability listings, Listing 12.05B requires a claimant to have "[a] valid verbal, performance, or full scale IQ of 59 or less." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Section 12.05.

Richardson contends all that is necessary to meet 12.05B is a valid IQ score of 59 or less. (Doc. 11 at 8). In support, she cites *Crayton v. Callahan*, 120 F.3d 1217, 1219-20 (11th Cir. 1997). In *Crayton*, the court noted "[g]enerally, a claimant meets the criteria for presumptive disability under section 12.05(b) when the claimant presents a valid IQ score of 59 or less." *Id.* at 1219. Immediately prior to that, however, the court noted the three diagnostic criteria in the introductory paragraph: "a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." *Id.* A claimant's IQ scores alone are insufficient to *establish* disability under Listing 12.05B; as noted above, they create a rebuttable presumption of adaptive deficits sufficient to meet the Listing's diagnostic criteria. *See O'Neal*, 614 F. App'x. at 459-60 (citing *Hodges*, 276 F.3d at 1269)).

Richardson's argument she is disabled at Listing 12.05B fails for one of the same reasons she is not disabled at Listing 12.05C: as described above, she lacks the adaptive deficits that would satisfy the Listing's diagnostic criteria. Even though she presented valid IQ scores that would satisfy the criteria in paragraph B, the evidence of Richardson's daily living identified by the ALJ in rejecting Richardson's original finding of disability at Listing 12.05C rebuts any presumption of adaptive deficits that arose from the IQ scores. Therefore, it was not error that the ALJ did not find Richardson disabled at Listing 12.05B, and his decision is supported by the same substantial evidence that supports his conclusion Richardson is not disabled at Listing 12.05C because she does not meet the Listing's diagnostic criteria.

## VI. Conclusion

Because the Commissioner's decision is based on substantial evidence and the ALJ applied proper legal standards, it is **AFFIRMED** and this action will be **DISMISSED WITH PREJUDICE**. A separate order will be entered.

DONE this 29th day of September, 2017.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE